UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

LUXSOMA LLC,

                           Plaintiff,

              v.

LEG RESOURCE, INC., WAYNE
LEDERMAN, and ORI INDUSTRIA S.P.A.,

                        Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: January 25, 2018

15 Civ. 4838 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff LuxSoma LLC ("LuxSoma") brought this action in June 2015 alleging that Defendant ORI Industria S.p.A. ("ORI") had breached an implied contract that, in LuxSoma's estimation, granted it exclusive rights to distribute ORI merchandise in the United States. LuxSoma further alleged that this breach was induced by Defendants Leg Resource, Inc. ("Leg") and its President, Wayne Lederman ("Lederman" and, together with Leg, the "Leg Defendants"), who signed an Exclusive Distributorship Agreement with ORI in June 2012. LuxSoma asserted claims for breach of contract; interference with prospective economic advantage; false advertising in violation of the Lanham Act, 15 U.S.C. § 1125; and unfair competition. Only the Leg Defendants were served; they now move for summary judgment and, in the alternative, to preclude the testimony of LuxSoma's expert, James Dooley.

The Leg Defendants advance three principal arguments in favor of summary judgment: (i) there was no contract between ORI and LuxSoma;

(ii) even if such a contract existed, the Leg Defendants lacked knowledge of it; and (iii) neither Leg nor Lederman made any actionable misstatements. The Court agrees. On this record, no reasonable juror could find that the Leg Defendants knew that LuxSoma had *any* business relationship with ORI, let alone an exclusive distributorship, and no reasonable juror could find that Leg or Lederman made any material misstatements in discussing Leg's business relationship with ORI.

**BACKGROUND**[1]

## A. Factual Background

### 1. LuxSoma Solicits a Business Relationship with ORI

Violetta Lozovyy and her husband, Joseph Lozovyy, established LuxSoma in 2011 with a clear vision: to sell ORI legwear to American consumers. (Def.

---

[1] For ease of reference, the Court refers to the Second Amended Complaint as "SAC" (Dkt. #27); to LuxSoma's memorandum of law in opposition to the motion for summary judgment as "Pl. Opp." (Dkt. #122); to Defendants' Statement of Facts Pursuant to Local Rule 56.1 as "Def. 56.1" (Dkt. #102); to Plaintiff's Counterstatement of Facts Pursuant to Local Rule 56.1 as "Pl. 56.1" (Dkt. #126), and to Defendants' reply thereto as "Def. 56.1 Reply" (Dkt. #128); to Joseph Lozovyy's deposition, dated May 23, 2016, as "J. Lozovyy Dep." (Dkt. #101-9); to Violetta Lozovyy's deposition, dated June 10, 2016, as "V. Lozovyy Dep." (Dkt. #101-5); to Leonardo Costantini's deposition, dated November 14, 2016, as "Costantini Dep." (Dkt. #101-10); and to Wayne Lederman's deposition, dated May 11, 2016, as "Lederman Dep." (Dkt. #101-15).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Generally speaking, where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. Civ. P. 56(c)."). The Court will address LuxSoma's imperfect compliance with these Local Rules in the Discussion section, *infra.*

56.1 ¶¶ 7, 18).  In May 2011, Mrs. Lozovyy, LuxSoma's Vice President of Sales, informed ORI that she wished to sell ORI merchandise in the United States. (*Id.* at ¶¶ 5, 8).  ORI invited her to visit the company in Italy, but warned her that "we have very strict conditions with whom we do business.  If you can satisfy those conditions, we can discuss further."  (*Id.* at ¶ 9).  Additionally, ORI indicated that LuxSoma would have to purchase €20,000 of merchandise in order to "start any negotiation or conversation."  (*Id.* at ¶ 10).

Mrs. Lozovyy visited ORI in early June 2011.  (Def. 56.1 ¶ 11).  She met with Leonardo Costantini, who had been hired as ORI's Export Sales Manager the prior month.  (*Id.* at ¶¶ 22, 23).  Costantini — as he takes pains to stress — was "not a manager" but "a simple employee."  (*Id.* at ¶ 26).  Mrs. Lozovyy and Costantini met for "three or four hours," and Giovana Mira, ORI's co-owner, briefly joined them.  (Costantini Dep. 35:2-12).

The Italy trip bore fruit:  On June 20, 2011, LuxSoma signed a Non-Exclusive and Temporary Trademark License Contract with ORI.  (Def. 56.1 ¶ 30).  The contract permitted LuxSoma "to promote and market ORI products ... in the territory of the U.S.A."  (*Id.* at ¶ 32).  It granted LuxSoma a "non-exclusive" trademark license, set to automatically expire on October 31, 2011.  (*Id.* at ¶¶ 34, 35).  This trademark license — the only written contract between ORI and LuxSoma — was never renewed.  (Def. 56.1 ¶ 36).

After ORI granted LuxSoma a non-exclusive trademark license, Costantini sent LuxSoma promotional materials to help LuxSoma market ORI merchandise in the United States.  One such document described LuxSoma as

ORI's "exclusive distributor."  It stated:  "Thanks to LuxSoma, LLC, as a partner of ORI Industria S.p.A., and an exclusive distributor, ORI brand is now in the USA."  (Dkt. #101-36).  That was the only document LuxSoma ever received that referred to it as ORI's exclusive distributor.  (J. Lozovyy Dep. 130:4-9).

### 2.    LuxSoma's Exchanges with ORI Regarding Exclusivity

As it happened, this reference to LuxSoma as an "exclusive distributor" appears to have been more aspirational than actual.  Eventually, LuxSoma discussed with ORI the possibility of becoming its exclusive distributor in the United States.  ORI responded that, to become ORI's sole distributor, LuxSoma would first have to prove itself by purchasing large quantities of merchandise.  As Mrs. Lozovyy explained:  "[ORI] said we don't provide anything in writing.  Immediately once you establish yourself and deliver [€]500,000 ... we can re-discuss that possibility."  (Def. 56.1 ¶ 11).  She further stated:  "[T]o have [exclusivity] set in stone in the writing for years to come, at some point they said you know, if you give me [€]500,000 ... on the table, we will consider [it]."  (V. Lozovyy Dep. at 186:9-13).  Mr. Lozovyy had a similar understanding:  "When we asked Giovana [Mira] about the exclusive rights, we asked what would it take.  She said 'Volume.  Give us volume, we give you exclusive rights.'"  (Def. 56.1 ¶ 15).  He recalled that Mira then stated, "if you buy from

us on[e] quarter of [a] million, €250,000 … I will give you exclusive rights right now." (Def. 56.1 Reply ¶ 15).[2]

LuxSoma assumed that any exclusivity deal would be in writing. (V. Lozovyy Dep. 70:25-71:4). There was in fact no written deal. LuxSoma acknowledges that it never negotiated with ORI for exclusive rights to sell ORI merchandise (Def. 56.1 ¶ 18), nor did it have a plan to pursue any such discussions (*id.* at ¶ 12). ORI, for its part, never provided LuxSoma with a specific timeframe within which ORI might grant LuxSoma exclusivity. (V. Lozovyy Dep. 64:15-19).

### 3.    LuxSoma's Efforts to Sell ORI Merchandise

In July 2011, LuxSoma made an initial purchase of €20,000 of ORI merchandise. (Pl. 56.1 ¶ 15). LuxSoma then sought to sell the merchandise. It opened kiosks in malls in Dallas, Texas. (*Id.* at ¶ 36). It hoped that, by selling to individual customers, it might "familiarize the public with the … new brand." (V. Lozovyy Dep. 73:15-22). These efforts did not bear fruit: From

---

[2]    At times during his deposition, Costantini appeared to suggest that the quantity of merchandise LuxSoma had to purchase to become ORI's exclusive distributor was smaller. (Costantini Dep. 36:20-37:5). But Costantini also made clear that LuxSoma would have had to prove itself before ORI would deal with it exclusively. He explained that "it is typical Italian not to give contracts from the beginning, but it's like a test, test-something, for the distribution." (*Id.* at 99:12-16). He further averred that ORI would have ended the relationship if LuxSoma failed to purchase a sufficient quantity of merchandise. (*Id.* at 46:5-16).

According to Costantini, by February 2012, the relationship between ORI and LuxSoma had deteriorated because there were no sales. (Def. 56.1 ¶¶ 72, 73). The Court notes that a late-produced email from LuxSoma, the provenance and authenticity of which Defendants reasonably contest, suggests that on January 27, 2012, Costantini may have written to LuxSoma stating that it would be ORI's sole distributor. (Dkt. #56-1). Even if the Court presumes the email to be authentic, Costantini's testimony, viewed in its totality, suggests that as of February 25, 2012, ORI's relationship with LuxSoma had deteriorated, and any exclusive right that LuxSoma might previously have enjoyed had been severely jeopardized.

August to November 2011, LuxSoma sold a mere 500 to 1,000 units of hosiery to individual consumers. (Def. 56.1 ¶ 43).

LuxSoma also tried to sell ORI merchandise to retail buyers. In August 2011, Mrs. Lozovyy contacted Neiman Marcus. (Def. 56.1 ¶44). She sent Neiman Marcus samples of ORI merchandise and repeatedly tried to convince Neiman Marcus to carry ORI products. (*Id.* at ¶ 46). However, Neiman Marcus never placed an order. (*Id.* at ¶ 47). Nor did Nordstrom (*id.* at ¶ 50), Dillard's (V. Lozovyy Dep. 114:21-23), or any other department store.

After selling just 500 to 1,000 units of hosiery at the kiosks and failing to secure any orders from department stores, LuxSoma next targeted online vendors. Over time, LuxSoma managed to sell a modest quantity of ORI merchandise online. It claims to have received purchase orders from HerRoom.com starting in late June 2012. (V. Lozovyy Dep. 121:5-20). From October 2012 until October 2015, LuxSoma sold merchandise to Zulily. (Def. 56.1 ¶ 53). LuxSoma also sold to an online retailer called Ideally, which made its first purchase in September 2013. (V. Lozovyy Dep. 126:9-15). Finally, sometime in the Summer of 2012, LuxSoma sold ORI products to Brands Exclusive, an online vendor in Australia. (*Id.* at 127:9-128:6).

### 4. ORI's Disappointment with LuxSoma's Results

LuxSoma sent ORI periodic updates. ORI knew of LuxSoma's modest sales at the Dallas kiosks and of its inability to secure any orders from department stores. (Def. 56.1 ¶¶ 56-58). By February 2012, ORI was

concerned: LuxSoma's last sale had occurred in September 2011. (*Id.* at ¶ 57). And there was little reason to believe that business would suddenly pick up.

LuxSoma's messages to ORI did little to inspire confidence. On February 17, 2012, Mrs. Lozovyy emailed Costantini to advise that "we have sold very little of [the] ORI product that we … brought to the US last summer. We have given away almost half now just to bring a little awareness to the US about ORI." (Dkt. #101-16 at 9). She estimated that LuxSoma would need "at least 2-5 years to see something solid com[e] out of [its efforts to sell] ORI in the USA." (*Id.*). On February 24, 2012, Mrs. Lozovyy wrote, "we have not generated ANY profit from the previous 2 shipments." (Dkt. #101-7 at 18). In consequence, she advised, "the request to deliver the payment for [the Spring/Summer] collection is NOT feasible." (*Id.*).

One day later, on February 25, 2012, Mrs. Lozovyy told ORI that the "sale[] of ORI product by LuxSoma has been frozen 'indefinitely' (so far we have sold a little more than 500 pairs total from 9,000 pairs that we had in our inventory)." (Def. 56.1 ¶ 64). On February 27, 2012, she said that "[w]ithout the name of [a] [b]ig [d]epartment store, ORI will not sell," and "future investments [would] not [be] cost effective." (Dkt. #101-7 at 19). On February 29, 2012, she wrote: "I am already $60,000 in trouble and considering this to be a total loss!! Investing more into ORI … will make my situation even wor[se], so I have more to [lose] and nothing to gain!" (*Id.* at 24).

Indicative of its financial distress, LuxSoma never paid in full for an order of Spring/Summer 2012 merchandise. (Def. 56.1 ¶ 69). Thus, in ORI's

view, as of June 2012, "the U.S. market was still open" "because [LuxSoma's] sales … were so small." (Costantini Dep. 90:2-5). Costantini explained that "[t]he sales in the U.S. were so small there was no[t] really a presence of the product[;] … if I have a virgin market, I can go to anybody, anyone, to try to promote new products." (*Id.* at 90:12-17).

### 5. Leg's Exclusive Distributorship Agreement with ORI

ORI sought a viable partner for the U.S. market. (Def. 56.1 ¶ 88). Lederman, Leg's President, first heard of ORI in February 2012, when a friend told Lederman that ORI had contacted him. (*Id.* at ¶¶ 86, 87). Lederman met with Giovana Mira and Marco Mira on April 16, 2012. (*Id.* at ¶ 94). He assumed that ORI had never sold its merchandise in the United States because "[t]he way they were pursuing [a partnership with Leg] was as if they hadn't." (*Id.* at ¶ 107). Mr. and Mrs. Mira never told Lederman that they had previously dealt with LuxSoma. (*Id.*).

During discussions with ORI, Leg insisted on exclusivity. (Lederman Dep. 28:11-25). According to Lederman, Leg would "never" have worked with ORI "unless it was exclusive." (*Id.* at 28:24-29:8). Exclusivity "was the criteri[on] with which [Leg] decided to move forward." (*Id.*). ORI acceded to Leg's demand, and on June 21, 2012, they executed a written Exclusive Distributorship Agreement according to which ORI appointed Leg as an "exclusive distributor for [ORI's] [p]roducts." (Def. 56.1 ¶¶ 115, 118). The agreement, valid through December 31, 2015, would automatically extend unless terminated by either party. (*Id.* at ¶ 116). It stipulated that ORI may

not "sell [its p]roducts to any other person or entity [in North America] without [Leg's] previous written consent." (*Id.* at ¶ 119).

On July 10, 2012, Leg and ORI sent an announcement to buyers and retailers stating that ORI would be introduced to the United States for the first in August 2012, and that Leg was ORI's exclusive distributor for North America. (SAC ¶ 30). They also placed an advertisement in the July 23, 2012 edition of *Women's Wear Daily* stating that ORI "is gearing up for a journey to North America," with the ORI products to be distributed starting in August 2012. (*Id.* at ¶ 29).

### 6. The Leg Defendants' Ignorance of ORI's Prior Dealings with LuxSoma

After ORI and Leg agreed to collaborate, Leg held itself out as ORI's exclusive distributor in North America. It did so to gauge buyer interest and to get buyers' feedback. (Def. 56.1 ¶ 110). It reached out to buyers from numerous department stores and online retailers; none of these buyers told Defendants that LuxSoma had previously tried to sell them ORI products. (*Id.* at ¶ 108).

Leg first learned of LuxSoma's existence in July 2012. As Lederman explained:

> Sometime in early July I was ... told by the owner of ORI that ... they had a relationship with a[] woman in Texas [i.e., Mrs. Lozovyy], and this woman had purchased some product from them ... with the intention of selling it, and hadn't been successful.

(Lederman Dep. 41:8-19).  He further stated that, "[a]ccording to ORI, [LuxSoma] had no arrangement [to be ORI's exclusive dealer]." (*Id.* at 45:16-17).

In an email dated August 1, 2015, Lederman wrote that he first learned of LuxSoma on July 6, 2012.  (Dkt. #101-30 at 50).  That day, Giovana Mira gave Lederman LuxSoma's contact information, on the theory "that maybe it would be a good idea … t[o] explore the possibility of reaching out and trying to collaborate with this woman with the idea that maybe [she could] help the effort.  So, that's what I did." (Lederman Dep. 41:8-19).  On July 13, 2012, Mrs. Lozovyy met with Lederman to discuss the possibility of collaborating to sell ORI merchandise.  (Def. 56.1 ¶ 144).  Though Mrs. Lozovyy would later note that it "was a pleasure and relief to meet [Lederman]" (*id.*), the companies ultimately were unable to agree on terms for collaboration.  There is no evidence that Mrs. Lozovyy told Lederman that LuxSoma was ORI's exclusive distributor or that she believed that the Leg Defendants were inducing a breach of contract.

## B.  Procedural Background

LuxSoma filed this action on June 29, 2015.  (Dkt. #2).  It filed an Amended Complaint on August 13, 2015, adding ORI as a defendant, (Dkt. #16), and a Second Amended Complaint on October 22, 2015, withdrawing a civil RICO claim (Dkt. #27).  According to the docket in this case, ORI has yet to be served.

On April 7, 2017, the Leg Defendants moved for summary judgment (Dkt. #100); they also moved to preclude LuxSoma's expert testimony (Dkt. #105). On May 18, 2017, LuxSoma filed a six-page brief in opposition to the motion for summary judgment (Dkt. #122), and a two-page brief in opposition to the motion to preclude expert testimony (Dkt. #124). On June 5, 2017, the Leg Defendants filed their reply briefs. (Dkt. #127, 129).

## DISCUSSION

### A. Applicable Law

#### 1. Summary Judgment

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

While the moving party "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,'" *ICC Chem. Corp.* v. *Nordic Tankers Trading a/s*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Catrett*, 477 U.S. at 323), the party opposing summary judgment "must do more than

simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). In considering "what may reasonably be inferred" from witness testimony, however, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak* v. *City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita,* 475 U.S. at 587; *Wyler* v. *United States,* 725 F.2d 156, 160 (2d Cir. 1983)); *accord Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

Additionally, parties advancing or opposing summary judgment motions in this District must comply with Local Rule 56.1, which provides in relevant part:

> (c) Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.
>
> (d) Each statement by the movant or opponent ... , including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).

S.D.N.Y. Local Rule 56.1(c), (d). LuxSoma's compliance with this rule has been spotty at best; among other transgressions, it has contested numerous material facts proffered by the Leg Defendants with only conclusory denials, and it has sought to engraft disputed facts and arguments onto several of the Leg Defendants' undisputed (and undisputable) facts. But while the Court finds considerable merit to the Leg Defendants' grievances in this regard (*see* Dkt. #128), it resolves their summary judgment motion on a narrower basis.

## 2. Choice of Law

Though neither side addresses the choice-of-law issue, there is little doubt that the applicable law for the principal causes of action at issue — inducement of breach of contract, tortious interference with prospective economic advantage, and unfair competition — is New York law. Leg is incorporated in the State of New York and has its principal place of business

13

there.  (SAC ¶ 3).  Moreover, the events giving rise to this action primarily occurred in New York.  In particular, the meeting in March or April of 2012 between Leg and ORI representatives, during which they discussed their terms of engagement (including Leg's exclusive distribution rights), took place in New York.  (Def. 56.1 ¶ 94).

Under New York's choice-of-law principles, the law of the jurisdiction with the greatest interest in adjudicating the issues raised in the litigation governs.  *See, e.g.*, *Babcock* v. *Jackson*, 12 N.Y.2d 473, 484 (1963).  Here, New York law applies because Leg is incorporated in the State of New York, its principal place of business is New York, and the contract between Leg and ORI was negotiated in New York.

**B.    Discussion**

### 1.    Summary Judgment Is Warranted as to LuxSoma's Claim for Inducement of Breach of Contract

Under New York law, "[t]he tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements:  [i] the existence of a contract between plaintiff and a third party; [ii] defendant's knowledge of the contract; [iii] defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and [iv] damages to plaintiff."  *Kronos, Inc.* v. *AVX Corp.*, 81 N.Y.2d 90, 94 (1993) (internal citations omitted).  "[A] central requirement for this cause of action under New York law is the existence of a valid, enforceable contract between the plaintiff and a third party."  *Scutti Enterprises, LLC* v. *Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).  A plaintiff must

also establish "the defendant's intentional and unjustified procurement of the third party's breach of the contract." *Katel L.L.C.* v. *AT & T Corp.*, 607 F.3d 60, 66 (2d Cir. 2010) (internal quotation marks and citation omitted).

Despite LuxSoma's various efforts to elide the issue, the record is simply devoid of admissible evidence that the Leg Defendants knew of any relationship between LuxSoma and ORI before July 2012. Mrs. Lozovyy professed a vague recollection that Costantini once said: "he's not sure, but he believes [that] as early as February [2012] Leg Resource knew about our relationship." (V. Lozovyy Dep. 208:23-25). When pressed, however, she admitted that Costantini "didn't give me any details" (*id.* at 209:5), and that she had no other reason to believe that Leg knew of LuxSoma's relationship with ORI (*id.* at 209:19-24). Costantini, for his part, has never stated that the Leg Defendants had any knowledge of ORI's dealings with LuxSoma before July 2012.

On the other hand, there is compelling evidence that the Leg Defendants did not learn of LuxSoma's existence — much less about its purported contract with ORI — before July 2012. Lederman testified that nobody at Leg was made aware of LuxSoma's existence until early July 2012. (Def. 56.1 ¶¶ 107, 108, 133). None of the prospective buyers at the department stores and online retailers informed the Leg Defendants that LuxSoma had previously tried to sell them ORI merchandise. (*Id.*). In an email dated August 1, 2015, Lederman stated that he first learned of Mrs. Lozovyy on or about July 6, 2012 (Dkt. #101-30 at 50), when Giovana Mira, ORI's co-owner, mentioned that ORI had previously worked with LuxSoma (Def. 56.1 ¶ 134).

15

Bereft of evidence, LuxSoma resorts to rumination, observing that "it is hard to believe that [Lederman] did not ask ... whether ORI's products had ever been sold before in the U.S." (Pl. Opp. 2). Yet LuxSoma fails to provide any legal or evidentiary basis for this statement. Instead, it asks this Court merely to presume that the Leg Defendants had knowledge of LuxSoma's dealings with ORI. That, this Court cannot — and will not — do.

LuxSoma's next assertion — that Leg must have been aware of LuxSoma because of the latter's "sophisticated web site" — fares no better. (Pl. Opp. 2). LuxSoma appears to argue that, because they were competitors, Leg must have known of LuxSoma. But that is belied by LuxSoma's own admission that it had not heard of Leg until the summer of 2012. (V. Lozovyy Dep. 157:22-158:7). If LuxSoma had no knowledge of Leg, it is reasonable — and, indeed, likely, given that Leg was the larger, more established company — that Leg had never heard of LuxSoma. That is particularly true given that, by June 2012, LuxSoma had only sold ORI merchandise in small quantities at kiosks in Dallas, Texas. On the record before it, the Court finds that no reasonable juror could conclude that Leg or Lederman was aware of any dealings between LuxSoma and ORI before July 2012.

Without such knowledge, LuxSoma's first claim — that the Leg Defendants induced a breach of contract — fails as a matter of law. Law and logic dictate that a party with no knowledge of a contract cannot be held liable for inducing its breach. *See, e.g.*, *Kronos*, 81 N.Y.2d at 94. It is only "when there is knowledge of a contract, and a competitor takes an active part in

16

persuading a party to the contract to breach it by offering better terms or other incentives [that] there is an unjustifiable interference with the contract." *White Plains Coat & Apron Co.* v. *Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) (internal quotation marks and citation omitted). No reasonable juror could find that Defendants knew of any contract or of any business dealings between LuxSoma and ORI.

The Court pauses to note that another of Defendants' arguments — that, as of June 2012, there was no contract between LuxSoma and ORI — has considerable traction. The record strongly suggests that, by the spring of 2012, LuxSoma had failed to sell enough legwear to maintain its relationship with ORI, much less acquire an exclusive distributorship. Costantini testified that, to the extent there was an exclusive arrangement between ORI and LuxSoma, it was conditioned on LuxSoma's purchases of ORI merchandise. When asked what would happen if LuxSoma did not purchase sufficient product, Costantini stated that ORI would, in all likelihood, "end the relationship." (Def. 56.1 ¶ 55). He further testified that if LuxSoma failed to pay in full for an order of Spring/Summer 2012 merchandise, "the relationship was going to be ended, closed." (Costantini Dep. 71:12-17).

LuxSoma never did pay in full for any such order. (Def. 56.1 ¶ 69). Accordingly, by February 25, 2012, "the relationship with [LuxSoma] had already deteriorated" and "[t]he ORI company was upset with [LuxSoma]" because "there were no sales … [and] no invoices." (Costantini Dep. 68:2-9). As Costantini further explained, "The point was to have patience to get the

17

results, but there was not this kind of patience and there were no sales." (*Id.* at 74:9-12). Nothing in the record suggests that, as of June 2012, LuxSoma continued to be (if it had ever been) ORI's exclusive distributor.

LuxSoma's reaction to the news of ORI's partnership with Leg in June 2012 further supports the view that LuxSoma was not ORI's exclusive distributor. Upon learning that Leg was holding itself out as ORI's exclusive distributor, LuxSoma did not notify Leg or any potential customers that, in fact, LuxSoma was ORI's exclusive distributor. (V. Lozovyy Dep. 139:3-8). Instead, it called ORI and spoke with Costantini, who confirmed that Leg was now selling ORI products. As Mrs. Lozovyy recalled, "he said yes, there is somebody else, but it's nothing" and encouraged her to "continue your itinerary." (*Id.* at 139:9-140:25). LuxSoma never asked ORI to stop selling merchandise to Leg, or for Leg not to announce its partnership with ORI. Such passivity belies LuxSoma's claim that it had exclusive rights to sell ORI merchandise. Yet even if LuxSoma had an exclusive distributorship with ORI — a claim that this Court regards with deep skepticism — LuxSoma's inducement claim still fails because, as mentioned above, no reasonable juror could find that Defendants had knowledge of any such contract. Summary judgment is therefore appropriate.

### 2. Summary Judgment Is Warranted as to LuxSoma's Tortious Interference Claim

Under New York law, to prevail on a claim of tortious interference with prospective economic advantage, a plaintiff must prove that "[i] it had a business relationship with a third party; [ii] the defendant knew of that

relationship and intentionally interfered with it; [iii] the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and [iv] the defendant's interference caused injury to the relationship." *Carvel Corp.* v. *Noonan*, 350 F.3d 6, 17 (2d Cir. 2003). It is "a difficult [claim] to sustain, with requirements more demanding than those for interference with the performance of an existing contract." *PKG Group, LLC* v. *Gamma Croma, S.p.A.*, 446 F. Supp. 2d 249, 251 (S.D.N.Y. 2006) (quoting *Fine* v. *Dudley D. Doernberg & Co.*, 610 N.Y.S.2d 566, 566 (2d Dep't 1994) (internal quotation marks and alterations omitted)). "In all but the most egregious circumstances, 'dishonest, unfair, or improper means' must amount to misconduct that constitutes either a crime or an independent tort." *PKG Group*, 446 F. Supp. 2d at 251 (internal quotation marks and citation omitted).

There are two time periods relevant to LuxSoma's interference claim: pre-July 2012, when the Leg Defendants had no knowledge of any contract between LuxSoma and ORI; and post-July 2012, when the Leg Defendants knew of LuxSoma's prior dealings with ORI. As to the first period, LuxSoma's claim fails because, as this Court already found, no reasonable juror could find that the Leg Defendants knew of any dealings between LuxSoma and ORI. The Second Circuit has explained that a tortious interference claim can only succeed if the plaintiff proves, *inter alia*, that "defendant knew of th[e] relationship and intentionally interfered with it." *Noonan*, 350 F.3d at 17.

Nor can they be held liable for interfering with LuxSoma's relationship with ORI, whatever it was, after July 2012. By July 2012, the Leg Defendants

had signed an Exclusive Distributorship Agreement with ORI. To the extent they thereafter sought to prevent LuxSoma from purchasing merchandise directly from ORI, the Leg Defendants were merely acting to enforce their contractual rights. It is well established that "economic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality." *Foster* v. *Churchill*, 87 N.Y.2d 744, 750 (1996).

The Leg Defendants did not act maliciously or illegally. In fact, they negotiated in good faith with LuxSoma to see if the two companies might collaborate to promote ORI's brand, or in the alternative, if Leg could help LuxSoma sell its remaining ORI inventory. Far from engaging in malicious or illegal behavior, the Leg Defendants proved themselves to be reasonable economic actors that sought to prevent another from infringing on their exclusive distributorship. For this reason, LuxSoma's tortious interference claim against them fails as a matter of law.

### 3. Summary Judgment Is Warranted as to LuxSoma's Claims for False Advertising and Unfair Competition

To establish a false advertising claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, a plaintiff must prove the following elements: "[i] the defendant has made a false or misleading statement; [ii] the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; [iii] the deception is material in that it is likely to influence purchasing decisions; [iv] the defendant placed the false or misleading statement in interstate commerce; and [v] the plaintiff has been injured as a result of the misrepresentation, either by direct diversion of sales

or by a lessening of goodwill associated with its products." *Merck Eprova AG*

v. *Brookstone Pharmaceuticals, LLC*, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013)

(citing *S.C. Johnson & Son, Inc.*, v. *Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001);

*Cashmere & Camel Hair Mfrs. Inst.* v. *Saks Fifth Ave.*, 284 F.3d 302, 310-11

(1st Cir. 2002)).

The third element of the claim — materiality — requires LuxSoma to

demonstrate that the misrepresentations involved an "inherent or material

quality of the product." *Time Warner Cable, Inc.* v. *DIRECTV, Inc.*, 497 F.3d

144, 153 n.3 (2d Cir. 2007). LuxSoma must also show that "the alleged

inaccuracy in the statement at issue would affect the purchasing decisions of

consumers." *Merck Eprova*, 920 F. Supp. 2d at 423 (internal quotation marks

and citations omitted). "The plaintiff does not need to demonstrate that the

defendant's representations actually affected consumer behavior, but rather

only that they were likely to have done so." *Mylan Pharm., Inc.* v. *Proctor &*

*Gamble Co.*, 443 F. Supp. 2d 453, 463 (S.D.N.Y. 2006).

LuxSoma alleges that the Leg Defendants made material misstatements

when they announced, on July 10, 2012, that (i) they would introduce ORI

products to the U.S. market and (ii) they were ORI's exclusive distributor. (SAC

¶ 30). LuxSoma further alleges that the Leg Defendants repeated those

misstatements in an advertisement placed in the July 23, 2012 edition of

*Women's Wear Daily*, which stated that ORI was "gearing up for a journey to

North America" and that Leg was ORI's exclusive distributor. (*Id.* at ¶ 29).

LuxSoma claims that these statements were actionably false because LuxSoma

21

was ORI's exclusive distributor and had previously sold ORI merchandise at kiosks in Dallas, Texas.

The Court disagrees. To begin with, the Leg Defendants' statement that they were introducing ORI to the United States was not misleading because it could not have deceived a substantial portion of its intended audience. When the statement was made, LuxSoma's sales were minimal and geographically confined to Dallas, Texas. As ORI stated, "the U.S. market was still open" "because [LuxSoma's] sales were so small," and "[t]he sales in the U.S. were so small there was no[t] really a presence of the product." (Costantini Dep. 90:2-17). Even in LuxSoma's telling of events, it had sold a paltry 500 to 1,000 pairs of ORI legwear in Dallas, Texas. (Def. 56.1 ¶ 42). Those sales are far too small and much too geographically concentrated to raise a triable dispute that Defendants' statement could have misled "a substantial portion of the intended audience." *Merck Eprova*, 920 F. Supp. 2d at 416.

Leg's second statement — that it was ORI's exclusive distributor — was objectively true. As the record makes abundantly clear, Leg signed an Exclusive Distributorship Agreement with ORI in late June 2012. Therefore, by the time the alleged misstatements were made on July 10 and July 23, 2012, Leg had in fact become ORI's exclusive distributor. The statement is accurate on its face, and no reasonable juror could find otherwise.

LuxSoma's unfair competition claim fails for the same reasons. Under New York law, the elements of unfair competition "closely parallel the elements of unfair competition under the Lanham Act." *Medisim Ltd.* v. *BestMed LLC*,

910 F. Supp. 2d 591, 606 (S.D.N.Y. 2012). A claim sounding in unfair competition "is identical to a Lanham Act claim, save for the additional requirement that plaintiff show defendant's bad faith." *Heptagon Creations, Ltd.* v. *Core Group Marketing LLC*, No. 11 Civ. 1794 (LTS) (AJP), 2011 WL 6600267, at *9 (S.D.N.Y. Dec. 22, 2011). Because this Court has already found that LuxSoma's Lanham Act claim fails as a matter of law, and because LuxSoma has not provided any evidence of bad faith, LuxSoma's unfair competition claim cannot succeed.

## CONCLUSION

For the reasons mentioned above, the motion for summary judgment of Defendants Leg Resource, Inc. and Wayne Lederman is GRANTED. The Court declines to address the motion to preclude expert testimony, which motion has been rendered moot by this decision. The Clerk of Court is directed to terminate the motions at Docket Entries 100 and 105. LuxSoma is ordered to advise the Court, by letter on or before **February 23, 2018**, as to the status of service on the sole remaining Defendant in this action, ORI Industria S.p.A.

SO ORDERED.

Dated:      January 25, 2018
            New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge